UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

       Plaintiff,                          Case No. 25-mc-51526

v.

DAVID TAYLOR et al.,              Honorable Terrence G. Berg

       Defendants,

KINGDOM OF GOD GLOBAL CHURCH

       Petitioner.
_____

**Petitioner's Reply in Support of its Petition for Immediate Return of Property**

      Unsurprisingly, the government cites Section 853(k) in arguing that the Court cannot consider the Kingdom of God Global Church's petition. But here, at least as to certain Church funds, this would lead to a constitutionally unacceptable result: one in which a church, charged with no crime, is deprived of access to funds needed to fulfill its religious mandate. The government's brief confirms this concern, failing to point to any tie between $2.9 million in seized funds and any criminal acts.

      The Church needs these specific funds to perform basic religious functions and to maintain the physical buildings it owns. Religious functions include communal housing and providing for 75 student ministers, volunteers, and pastors[1]

---

[1] Upon request, the Church will submit the names of the student ministers, volunteers, and pastors for the Court's review *in camera*.

1

living free of charge while they are trained as future ministers, at a yearly cost of about $1 million, including about $45,000 for residents' medical care [Exh. A], $565,000 ($250/day) for their food expenses annually at all locations and $143,000 for food at the Houston property [Exh. B], $20,000 for water annually at the Houston campus alone [Exh. C] and even thousands of dollars for their personal hygiene products. Also, it needs thousands of dollars for repairs to the Church's buildings as a result of the raids [Exh. D, images, estimate, and invoices], on top of the $2.5 million the Church pays annually to maintain those structures – one of which has already defaulted on its mortgage [Exh. E, email re Tampa property].

These expenses will not wait for the prosecution of others to (*maybe*) one day result in a forfeiture order against some of the seized assets to adjudicate its rights. It will be too late. The Church care for its people and facilities now, and it can do so if simply permitted to use at least *some* seized funds to meet these basic needs.

**I.     The Church is entitled to seek equitable relief under Rule 41(g), because Section 853(k), as applied here, would violate its Free Exercise rights.**

Missing from the government's recitation of Section 853(k) cases are any in which the government seized money from an unindicted *church*, in violation of the church's Free Exercise rights. The Church has no legal remedy to vindicate *those rights*, because Section 853(n)(1) does not permit intervention until a forfeiture order is issued, which may not occur for years. Because Church assets are needed to maintain its essential functions *now*, the Church turned to equity, and Rule 41(g).

Under Rule 41(g), the Court "must receive evidence on any factual issue necessary to decide the motion." The Church has supplied that evidence, including in attached affidavits and material showing its ongoing need to fund its religious operations in pursuit of its religious mission. The costs run from paying for building repairs and maintenance to caring for the individuals housed therein. The Church stands ready to further develop this record at an evidentiary hearing if needed.

The government, meanwhile, has not met the procedural requirements for criminal forfeiture of *all* seized funds. While it may be sufficient in a typical case to force a third party to wait for Section 853(n)(1) to assert their rights to seized assets, forcing a third-party church to do so for assets needed to continue its religious mission would violate that church's Free Exercise rights.

Moreover, the Indictment only contains general forfeiture allegations [ECF No. 1 Page ID. 20-22] and the Bill of Particulars [ECF No. 5 Page ID n.35] only lists the Chase Bank Accounts. As to the $4.2 million in those accounts, the government fails to address the Church's contention that the 30 parishioners who worked in the ministry from 2016 to 2023 (the dates of the alleged illegal conduct in the Indictment), collectively raised only $1.3 million. [ECF No 1 PageID. 6]. Simply put, the government failed to provide allegations to support the seizure of the remaining $2.9 million of seized funds in its Response, Indictment, or Bill of Particulars.

3

As the government appears to concede by omission [see ECF No. 3, PageID.27], there is no evidentiary need to preserve this $2.9 million, which is fungible, and which is necessary for the Church to function. *See Luis v. United States*, 578 U.S. 5, 22 (2016) (barring the government from freezing untainted assets of even the criminal defendant when that seizure would impact another constitutional right, the Sixth Amendment's right to counsel of choice, despite Section 853(e) allowing the government to seize "property of equivalent value" when alleging that tainted assets had been dissipated).

**II.  The Church's religious liberty claims are valid.**

Contrary to the government's claims, the Church has standing and a factual basis to bring these religious liberty claims.

### a. The government's standing challenge fails.

The government challenges the first two standing elements (injury and causation). The Church meets both elements.

First, the Church *has* alleged facts demonstrating an actual or imminent, concrete, and particularized injury in fact from its loss of funding access—namely, the inability to fund pastoral operations. The government assumes the Church is meeting its spiritual mandate because, since the seizure, it has held worship services and posted them on YouTube. [ECF No. 3 PageID 24.] This incorrect assumption betrays a significant misunderstanding of the Church.

As provided in the Declarations of Student Missionaries [Exh. F], Parishioners [Exh. G], Church's bookkeeper Jessica Cross [Exh. H] and Vice President/Board Member Kearisten Jones [Exh. I] evidences actual injuries to the Church caused by the seizure of its bank accounts. Including, but not limited to, the inability to house, feed, provide medical care, and purchase other necessities for the volunteers, students and ministers who live in the Church's communal properties and participate in religiously compelled activities in pursuit of the Church's mission (Cross Aff. ¶11 Jones Aff. ¶10b,12), as well as the inability to pay for the expenses to maintain the physical premises for worship (Cross Aff. ¶9,12,13,17; Jones Aff. ¶11,13) – all of which will inevitably lead the Church to be without both a place for worship or congregants. Indeed, the Church defaulted on a mortgage secured by its Tampa Property and must find alternative financing or lose the property to foreclosure. (*See* Exh. E).

This imposition on the Church's ability to engage in these Church activities and communal worship is itself an injury. *See e.g. Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 330 (D. Md. 2025) (finding "reduction in attendance at worship services and ministry programs" as a result of an immigration enforcement policy placing armed law enforcement officers near places of worship, constituted an injury).

Second, as to causation, this case is nothing like *Alamo v. Clay*, which the government relies on in arguing that the Church's loss of its assets was caused by

5

the defendants' alleged conduct in this case. In *Clay*, after a pastor was *convicted* of a series of tax crimes, incarcerated, and denied parole, his church brought RFRA and First Amendment claims, arguing it was being denied his pastoral services. *Alamo v. Clay*, 137 F.3d 1366, 1369 (D.C. Cir. 1998). The court readily dismissed this argument on many grounds, including that the pastor's absence was due to *his* criminal activity for which he had been convicted and jailed. *Id.* Here, by contrast, the defendants have not been convicted of a crime, the Church's claims are not based upon the defendants' absence, and, most significantly, the government has not even explained why it seized $2.9 million in untainted funds belonging to the Church.

### b. The Church has asserted legitimate religious liberty claims.

The government next challenges the Church's religious liberty claims under the First Amendment and RFRA, arguing that, because Section 853(k)'s prohibition on pre-forfeiture order interventions by a third party when a criminal action is pending is neutral and generally applicable, it satisfies the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). [ECF no. 3, Page ID.16-17]. But Congress enacted RFRA in express response to *Smith*. 42 U.S.C.S. § 2000bb. RFRA states, under "Purposes," "(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to guarantee its application in cases where free exercise of religion is substantially burdened, and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by

6

government." 42 U.S.C. § 2000bb(b). It does so because "Congress finds that . . . (2) laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2).

Thus, the question here remains whether seizing the Church's funds creates a substantial burden. Again, it does. The Church cannot function if it cannot pay to support its students and pastors, or for its physical properties. *Cf. Soka Gakkal Int'l-USA v. United States Army Corps of Eng'rs*, No. 24-CV-62452-WPD, 2025 WL 2269858, at *5 (S.D. Fla. July 29, 2025) (denying a motion to dismiss a RFRA claim that Buddhist quiet, contemplative use of the plaintiffs' outdoor space would be substantially burdened by noise and vibration from the Corps' construction). Similarly, RFRA's definition of religious exercise includes the use of real property for religious purposes. 42 USCS § 2000cc-5. Finally, restricting the Church's ability to provide for ministers in training residing in its facilities creates a substantial burden, just as it would to seize all funds from a nunnery or monastery.

The government's cited cases involve decidedly different circumstances. Seizing all of a Church's funds by taking its bank accounts creates far more of an imposition than zoning restrictions on houses of worship (as in *Congregation Kol Ami*), or restrictions on sales hours for certain commodities (as in *Braunfeld*), or having to abide by a landmarks law (as in *St. Bartholomew's*, a pre-RFRA case), or having an unlicensed radio transmitter seized (as in *Any & All Radio Station Transmission*).

This leaves the question of whether seizing these funds is the least restrictive means to further a compelling interest. This is an "exceptionally demanding" standard, requiring the government to demonstrate that "it lacks other means of achieving its desired goal without imposing a substantial burden." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Here, the government still has not offered *any* allegations tying the $2.9 million to criminal activity in the first place.

### III. Conclusion

The Church's motion should be granted.

                                        Respectfully submitted,

                                        /s/ Jorin G. Rubin
                                        JORIN G. RUBIN
                                        Rubin Frampton
                                        Attorney Kingdom of God Global Church
Date: February 6, 2026            jorinrubin@comcast.com